**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                                  :
In re                                                             :  Chapter 7
                                                                  :
LOUIS FREY COMPANY, INC.,                                         :  Case No. 03-15297 (SMB)
                Debtor.                                           :  Adv. P. No. 04-3365 (SMB)
------------------------------------------------------------------x
AMERICAN REPROGRAPHICS COMPANY, LLC                               :
also d/b/a/ BP INDEPENDENT REPROGRAPHICS,                         :
                                                                  :  06 Civ. 7587 (RMB)
                Defendants-Appellants                             :  06 Civ. 7588 (RMB)
                                                                  :
        - against -                                               :  **ORDER**
                                                                  :
YANN GERON as Trustee of the Estate of                            :
Louis Frey Company, Inc.,                                         :
                                                                  :
                Plaintiff-Appellee.                               :
------------------------------------------------------------------x

**I.     Background**

On or about September 20, 2006, American Reprographics Company, LLC ("ARC") and BP Independent Reprographics ("BPI") (together, "Appellants") appealed, pursuant to 28 U.S.C. § 158(a) and Rule 8001 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. Pro."), from a Judgment, dated August 16, 2006 ("Judgment"), entered by the Honorable Stuart M. Bernstein, Chief United States Bankruptcy Judge, Southern District of New York ("Bankruptcy Court"), awarding Yann Geron ("Geron" or "Trustee" or "Appellee"), as Trustee of the Estate of Louis Frey Company, Inc. ("Frey" or "Debtor"), $9,061,793.00 in compensatory damages, $2 million in punitive damages, and interest in the amount of $2,377,417.20 following a six day bench trial which had commenced on April 3, 2006.  The Bankruptcy Court found that ARC and BPI had "misappropriated the Debtor's confidential customer information, improperly diverted the Debtor's business and destroyed the Debtor's ability to operate."[1]  (Post-Trial Findings of Fact and

---

[1]     After trial, the Bankruptcy Court also dismissed with prejudice claims against ARC and BPI

Conclusions of Law, dated July 28, 2006 ("FFCL"), at 3.)  The Bankruptcy Court also awarded the Trustee interest in the amount of $2,377,417.20 and $2 million in punitive damages.  (See Judgment at 2.)

Before filing for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq., on August 22, 2003, Frey was a New York corporation engaged "in the business of creating specialized commercial blueprint reproductions for architects, engineers and contractors."  (Joint Pre-Trial Order, dated December 13, 2005 ("JPTO") at 13.)[2]  ARC is a Delaware corporation which "is a leading provider of reprographic services in the United States and . . . in Canada."  (JPTO at 8.)  ARC's subsidiary, BPI, "provide[s] reprographics services in the greater New York metropolitan area" and "was a direct competitor of [Frey]."  (JPTO at 8.)

On March 24, 2003, Frey and ARC executed a "non-binding letter of intent," dated March 19, 2003, which "set forth ARC's . . . offer to purchase [the Debtor's] business for . . . up to $9.5 million."  (JPTO at 9.)  The proposed sale never occurred because due diligence revealed, among other things, that "[t]he Debtor was insolvent and in serious financial difficulty."  (JPTO at 10.)  Instead, Frey and ARC entered into a Management Agreement, dated May 15, 2003 ("Management Agreement"), pursuant to which "ARC had the authority to use its sole discretion in making the Debtor's business decisions."  (JPTO at 10.)  The Management Agreement "required ARC to operate Debtor's business in a reasonable manner and in the best interests of the Debtor" and provided that "during the term of the agreement, ARC and its affiliates would not use confidential

---

brought by Merrill Lynch Business Financial Services ("Merrill"), the Debtor's secured lender.  (See Judgment at 2.)  Merrill has not appealed and ARC and BPI have not pursued an appeal against Merrill, although they appear to have filed a Notice of Appeal with respect to Merrill on September 20, 2006.  (See Brief of Appellee, dated November 10, 2006 ("Appellee's Brief"), at 1, n.1 ("the appellants did not file a brief in 06 Civ. 7587, and confirmed to the appelleees that they chose not to do so").)

[2]   By order, dated October 13, 2003, the Bankruptcy Court converted Frey's bankruptcy to a Chapter 7 liquidation proceeding under 11 U.S.C. § 701 et seq., and the United States Trustee appointed Geron as Trustee.  (JPTO at 13.)

information about Debtor's business or customers obtained by reason of ARC's retention as manager." (JPTO at 11.) Despite ARC's efforts as manager, Frey's "business and . . . financial condition continued to decline." (JPTO at 11.)

By letter dated September 12, 2003 ("Termination Letter"), "ARC purported to terminate its management of the Debtor." (JPTO at 12; see also Appendix to Brief of Appellants/Defendants, dated October 20, 2006 ("Appellants' App."), Exhibit ("Ex.") 13 ("we hereby notify you that ARC has terminated the Management Agreement as of today's date").)[3] Despite having sent the Termination Letter, "ARC continued to act as Debtor's manager until September 26, 2003 (the "Shutdown Date"), when "agents of ARC informed the Debtor's employees . . . that ARC would no longer be managing the Debtor's business." (JPTO at 12.) Frey was unable to operate without a manager, and on the Shutdown Date "certain former Louis Frey employees were offered employment with BPI starting the following Monday, September 29, 2003." (JPTO at 13.) Fifteen (former) Frey customers became customers of BPI. (JPTO at 14.)

The Bankruptcy Court concluded, among other things, that ARC and BPI were liable for breaching the Management Agreement by failing to send the Termination Letter to Debtor's counsel (see FFCL at 30 ("the Management Agreement provided that notices had to be sent to the Debtor and to Debtor's counsel . . . but I find from the evidence that ARC never sent a copy to the Debtor's counsel")); for misappropriating the Debtor's trade secrets (see FFCL at 47 ("the Debtor's customer and pricing information were not well known, and were not ascertainable absent access to the Debtor's business records . . . [and Appellants'] use of that information constituted a misappropriation of the Debtor's trade secrets")); and for breaching their fiduciary duties to Frey (see FFCL at 51 ("the recitation of their breaches forms a remarkable catalogue of wrongdoing")).

---

[3]  The parties dispute whether the Termination Letter was transmitted to Frey in accordance with the Management Agreement which required that any notice of termination be sent to Frey's legal counsel. (See JPTO; Appellants' App. Ex. 8, § 18(b).)

The Bankruptcy Court's award of damages was based upon the Appellants' liability for breach of fiduciary duty, and no additional damages were awarded for the other causes of action for which liability was found, i.e., breach of contract, misappropriation of trade secrets, and unjust enrichment.  (See FFCL at 46, 47, 51.)

On appeal, ARC and BPI argue, among other things, that: (1) "[t]he Bankruptcy Court's finding that ARC breached the Management Agreement . . . is clearly erroneous and directly disproved by the record"; (2) "the Bankruptcy Court erred in holding that the Frey information allegedly misappropriated by ARC were trade secrets"; (3) the "conclusion that ARC breached its [fiduciary] duties to Frey and somehow caused the demise of Frey is untenable in light of the undisputed evidence"; (4) "[e]ven assuming . . . that the Trustee had established tortious conduct by ARC, that would not be sufficient to establish liability [because] . . . [t]he Trustee was also required to prove causation as an element of its claims"; (5) the Bankruptcy Court applied "an improper measure of damages"; and (6) "the Bankruptcy Court erred in awarding punitive damages."  (See Brief of Appellants/Defendants From the Judgment of the Bankruptcy Court, dated October 20, 2006 ("Appellants' Brief").)

The Trustee counters that: (1) the finding that the Termination Letter was never sent to Frey's counsel, in violation of the Management Agreement, "is amply supported by the record"; (2) "[o]n the evidence in the record, the bankruptcy court undoubtedly got the trade secret finding correct"; (3) "[t]here is ample evidence in the record to support the bankruptcy court in finding that ARC had breached its fiduciary duty"; (4) "requisite causation is clearly present"; (5) "[t]here is no improper conjecture or guess imbedded in the expert calculations [of damages]"; and (6) the "award of punitive damages for ARC's breach of fiduciary duty was not legal error."  (See Appellee's Brief.)

The parties have waived oral argument.

4

**For the reasons set forth below, the Bankruptcy Court's Judgment is affirmed.**

## II. Legal Standard

"On appeal, a district court reviews a bankruptcy court's finding of facts under a clearly erroneous standard . . . and its conclusions of law de novo." In re Enron Corp, --- BR ----, 2007 WL 646129, at *2 (S.D.N.Y. Mar. 2, 2007) (citing In re AroChem Corp., 176 F.3d 610, 620 (2d Cir. 1999)). "In applying the 'clearly erroneous' standard of review, a district court may reverse the bankruptcy court only where it is 'left with the definite and firm conviction that a mistake has been committed.'" BP Energy Co. v. Bethlehem Steel Corp., 2002 WL 31548723, at *2 (S.D.N.Y. Nov. 15, 2002) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

## III. Analysis

### (1) Breach of the Management Agreement

"It is hardly necessary to cite authority for the proposition that whether there has been a breach of contract is a question of fact." U.S. for Use of N. Maltese and Sons, Inc. v. Juno Const. Corp., 759 F.2d 253, 255 (2d Cir. 1985); see also Inner City Broadcasting Corp. v. Galaxy Broadcast, 1996 WL 328744, at *2 (S.D.N.Y. June 13, 1996).

The Management Agreement required that ARC send "any notice" not only to Frey's offices in New York City but also to Frey's outside counsel, Ronald Itzler ("Itzler"). (See Management Agreement § 18(b).) The evidence presented at trial supports the Bankruptcy Court's conclusion that ARC failed "to sen[d] a copy [of the Termination Letter] to the Debtor's counsel." (FFCL at 47.) Moreover, the Court agrees with the Bankruptcy Court that this failure caused "[t]he termination [to] remain a secret, and allowed [ARC and BPI] to remain in control." (FFCL at 47.) Among other things, Mark Legg, ARC's Chief Financial Officer who signed the Termination Letter on behalf of ARC, testified that he had "no direct recollection" of sending it to Itzler. (Trial Transcript, dated April 25, 2004 ("4/25 Tr."), at 96); see also In re Robbins Intern., Inc., 275 B.R.

5

456, 465 (S.D.N.Y. 2002) ("'[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'") (citing <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 574 (1985)).

**(2)     Misappropriation of Trade Secrets**

"[A] trade secret must first of all be a secret: whether it is [is] generally a question of fact." <u>Ashland Mgmt Inc. v. Janien</u>, 82 N.Y.2d 395, 407, 624 N.E.2d 1007 (1993); <u>see</u> <u>also</u> <u>Cross Media Marketing Corp. v. Nixon</u>, 2006 WL 2337177, at *3 (S.D.N.Y. Aug. 11, 2006). "In determining whether information constitutes a trade secret, New York courts have considered the following factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." <u>North Atlantic Instruments, Inc. v. Haber</u>, 188 F.3d 38, 44 (2d Cir. 1999) (citation omitted).

Although the Bankruptcy Court did not explicitly state these six factors, its conclusion "was not clearly erroneous." <u>In re Cross Media Marketing Corp.</u>, 2006 WL 2337177, at *5 (S.D.N.Y. Aug. 11, 2006); <u>see</u> <u>also</u> FFCL at 51 ("the Debtor's customer and pricing information were not well known, and were not ascertainable absent access to the Debtor's business records"). For example, with regard to whether Frey's customer information was known outside the business, BPI employee Shawn McMenamey ("McMenamey"), who was assigned to work at Frey's offices upon commencement of the Management Agreement, testified that before he gained access to Frey's business records he had not known who Frey's "biggest customers" were and was "surprised" to learn "that [Frey] handled them." (Trial Transcript, dated April 4, 2006 ("4/4 Tr.") at 201:21.)

McMenamey also testified that pricing information in the reprographics industry is generally considered confidential and that, on behalf of BPI, he "safeguard[s] that information and tr[ies] to keep it away from [his] competitors." (4/4 Tr. at 208.) The Bankruptcy Court's conclusion is also supported by the trial testimony of Roger Vincent, "an advisor" to the President and sole shareholder of Frey, Seymour Wiener ("Wiener"), who testified that "the terms under which [Frey] did business with [its customers] was considered confidential by Mr. Wiener." (Trial Transcript, dated April 26, 2006 ("4/26 Tr.") at 27:5.) And, the Management Agreement states that information concerning Frey's customers was confidential. (See Management Agreement, § 2(c) ("ARC . . . will not use confidential information about Frey's business or customers . . . .").) "Whether or not the bankruptcy court may have misstated the . . . rule, its findings clearly were not wrong." In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2d Cir. 1992); see also In re Martin, 817 F.2d 175, 182 (1st Cir. 1987) ("Historically, bankruptcy courts have been accorded wide discretion in connection with fact-intensive matters . . .").

**(3)    Breach of Fiduciary Duty**

Where, as here, a fiduciary duty is undertaken by agreement, "'the existence of a fiduciary relationship is a question of fact . . . .'" L-3 Communications Corp. v. OSI Systems, Inc., 2004 WL 42276, at *6 (S.D.N.Y. Jan. 8, 2004) (citation omitted); see also Zimmerman v. Pokart, 242 A.D.2d 202, 204, 662 N.Y.S.2d 5 (1st Dept. 1997) ("an allegation that a fiduciary breached his duty generally presents a question of fact").

"There is no dispute that ARC and BPI owed fiduciary duties to the Debtor," (FFCL at 30), and there was ample evidence presented at trial to support the Bankruptcy Court's conclusion that ARC and BPI breached those duties by "misappropriate[ing] the Debtor's customer lists and customer-related information for their own benefit, [driving] the Debtor out of whatever business was left, and acquir[ing] the Debtor's valuable customer relationships for their own benefit to the

7

detriment of the Debtor and its creditors." (FFCL at 33.) For example, after the Termination Letter was sent, but before the Shutdown Date, BPI's Comptroller instructed Frey's Assistant Vice President of Financial Operations, Dennis Quirk – who was offered a position with BPI immediately following the Shutdown Date – to "extract customer information from the Louis Frey system" and "reformat[] the information into a file that would be acceptable for import into [BPI's] accounting system." (4/4 Tr. at 54-56.) Evidence at trial also revealed that, despite the Termination Letter, ARC and BPI continued to relocate Frey's business operations to BPI's offices by rerouting Frey's telephone lines and moving boxes containing Frey's customer information. (See Trial Transcript, dated April 24, 2006 ("4/24 Tr."), at 32-33.)

The Bankruptcy Court also properly rejected Appellants' argument that their behavior was permissible under § 11(e) the Management Agreement which stated that "nothing in this Agreement or in the relationship of the parties or as a result of information learned by ARC while performing its duties hereunder shall be deemed to prohibit ARC from soliciting customers served by Frey after the termination of this Agreement or to give rise to a claim of unfair competition or a breach of any fiduciary duty by ARC." (Management Agreement § 11(e) (emphasis added).) ARC and BPI "misappropriated the customer information and integrated that information into BPI's computer system after ARC terminated the Management Agreement" and that when "they stole the information . . . they were no longer performing their duties under the Management Agreement." (FFCL at 32 (emphasis in original).)

**(4)    Causation**

"Causation generally is a question for the finder of fact." DePace v. Flaherty, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002). "[U]nder New York law, the level of causation required in breach of fiduciary duty . . . cases depends on the type of remedy sought." LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey, 173 F.3d 454, 465 (2d Cir. 1999). "[W]here . . . a plaintiff is

8

seeking to recover lost earnings or profits as damages for breach of fiduciary duty, one must prove with certainty that the loss resulted from the breach." American Federal Group, Ltd. v. Rotherberg, 2003 WL 22349673, at *16 (S.D.N.Y. Oct. 14, 2003) (citation omitted). "By contrast, where a plaintiff is seeking a 'restitutionary [remedy] to prevent the fiduciary's unjust enrichment as measured by his ill-gotten gain, the less stringent 'substantial factor' standard may be more appropriate." Id. (quoting LNC Investments, 173 F.3d at 465-66).

The Bankruptcy Court's award of damages under the breach of fiduciary duty claim was divided into two components – $8,164,793.00 for the Primary Component ("Primary Component"), representing "the customers taken and serviced by ARC," (FCCL at 34), and $897,000.00 for the Remainder Component ("Remainder Component"), representing the "customers that remained behind but could not be serviced because of ARC's actions." (FFCL at 34-35, 63.)

"The evidence at trial was sufficient to prove that the Defendants' breach of their fiduciary duty . . . was a substantial factor in causing an identifiable loss." F.D.I.C. ex rel. First New York Bank for Business v. Bober, 2003 WL 21976410, at *2 (S.D.N.Y. Aug. 19, 2003); see also American Federal Group, 2003 WL 22349673 at *16. For example, on the Shutdown Date, employees of ARC and BPI "contacted several [of Frey's customers] for the express purpose of soliciting their business for BPI," (FFCL at 17), "hired the Debtor's on-site . . . managers and continued to service the Debtor's former customers," (FFCL at 17), and "bill[ed] them and collect[ed] revenue for [their] own benefit. (FFCL at 17; see also 4/4 Tr. at 87-89; 4/25 Tr. at 215-16; 4/25 Tr. at 216-17.)

The Bankruptcy Court also properly rejected Appellants' argument "that the Debtor would have gone out of business and lost all of its customers anyway," (FFCL at 38, n. 18), concluding that, although "the Debtor had severe business problems, [it was] operating when [ARC and BPI] shut it down," and "[a]s a consequence of the Shutdown, the Debtor lost the chance to hire a new

9

manager and continue to operate, or alternatively, to sell an intact, ongoing business." (FFCL at 38, n. 18; see also FFCL at 15 ("ARC made no effort to hand control back to the Debtor; to the contrary, ARC's actions ensured that the Debtor could never operate again.")).) There was evidence that: (i) physical equipment and files had, as of the Shutdown Date, been moved to BPI's headquarters; (ii) on the Shutdown Date, representatives of BPI took "account listings of all the accounts that Louis Frey had in Manhattan" back to BPI's offices, (4/4 Tr. at 186); (iii) ARC and BPI used those account listings "as a source to contact [Frey's] customers," (4/4 Tr. at 210); and (iv) on the Shutdown Date, BPI offered jobs to many of Frey's employees, (see e.g. 4/4 Tr. at 145).

**(5)     Calculation of Damages**

Appellants argue that the Bankruptcy Court's calculation of damages "violates the requirement of New York law that damages awards not be 'speculative,'" (Appellants' Brief at 45), and that the Bankruptcy Court erred in granting the Trustee recovery on both the Primary and Remainder Components because "a plaintiff successfully prevailing on a breach of fiduciary duty claim may recover either the loss to plaintiff or the benefit to defendant." (Appellants' Brief at 46 (emphasis in original).) Appellee counters that damages were "computed . . . based on known, reliable factors . . . ," and that "ARC's breaches of fiduciary duty inflicted two separate and independent injuries" which "merit separate compensation." (Appellee's Brief at 23, 27.)

"Since the breach of fiduciary duty was proved, the [trial] court may be accorded significant leeway in ascertaining a fair approximation of the loss . . . so long as the court's methodology and findings are supported by inferences within the range of permissibility." Wolf v. Rand, 258 A.D.2d 401, 402, 685 N.Y.S.2d 708 (1st Dept. 1999) (internal citations omitted). "The mere fact that [a party] disagrees with the methodology utilized . . . or [a particular] assumption . . . does not render . . . proof speculative." Travellers Intern., A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1579 (2d Cir. 1994) (citation omitted). "A bankruptcy court's decision regarding the amount of damages

10

is a factual finding and will not be disturbed unless the finding is clearly erroneous." Ball v. A.O. Smith Corp., 321 B.R. 100, 110 (N.D.N.Y. Feb. 3, 2005) (citing In re Fugazy Express, Inc., 124 B.R. 426, 430 (Bankr. S.D.N.Y. 1991)).

The Bankruptcy Court based its calculation of damages, among other things, upon the testimony of Michael Aronow ("Aronow"), the Debtor's damages expert, who was found to be "the most credible of the three [experts who testified with regard to damages], and his methodology the most rigorous." (FFCL at 34.) By contrast, the Bankruptcy Court rejected the testimony of the Appellants' damages expert, Howard Brod Brownstein, concluding that his "opinion was unencumbered by any analysis." (FFCL at 42.) In sum, "[t]he damages for the Primary Component were calculated by measuring the benefit to ARC derived from the customers taken from the Debtor," which was "measured by the increase to ARC's enterprise value . . . attributable to the incremental earnings on sales to the Debtor's former customers." (FFCL at 35.) Aronow computed an Earnings Before Interest and Tax ("EBIT") percentage based upon the profit margin to the 15 former Frey customers who "defected to BPI," and then calculated how much the EBIT attributed to those customers increased ARC's enterprise value. (See FFCL at 35-37.) Adopting this methodology, and after making conservative adjustments in favor of ARC and BPI, the Bankruptcy Court (properly) arrived at a Primary Component damage calculation of $8,164,793. (FFCL at 37; see also Expert Report of Michael A. Aronow, dated Feb. 28, 2005, attached as Ex. 9 to Appellee's Appendix, dated November 10, 2006.)[4]

With regard to their argument that the Bankruptcy Court improperly awarded damages under both the Primary Component and the Remainder Component, Appellants rely unpersuasively

---

[4] The substance of the Appellants' argument that the Primary Component damages are speculative "is essentially a more finely-tuned and focused presentation of their ill-supported . . . position before the Bankruptcy Court," In re All-Flow, Inc., No. 94-CV-0134E, 1996 WL 107103, at *1 (W.D.N.Y. Mar. 8, 1996), and the Court does not conclude that the Bankruptcy Court's determination of the Primary Component damages was clearly erroneous.

11

upon <u>Gomez v. Bicknell</u>, 302 A.D.2d 107, 114, 756 N.Y.S.2d 209 (2d Dept. 2002), in which the court observed – in the context of an employee who usurped a corporate opportunity – that "as an alternative to an accounting of the disloyal employee's gain, a calculation of what the employer would have made of the diverted corporate opportunity is an available measure of damages" and that "[t]he choice of remedy belongs to the employer." The case at bar does not involve a disloyal employee, and Appellants have not offered any authority contradicting the Bankruptcy Court's determination that "[i]n addition to its consequential damages, the aggrieved party is entitled to recover the amount of the ill-gotten gains realized as a result of the breach." (FFCL at 34); <u>see also</u> <u>Diamond v. Oreamuno</u>, 24 N.Y.2d 494, 498, 248 N.E.2d 910 (N.Y. 1969) ("[T]he function of [an action for breach of fiduciary duty] is not merely to compensate the plaintiff for wrongs committed by the defendant but . . . to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others . . . .") (citation omitted).

**(6)     Punitive Damages**

"The limitation of an award for punitive damages to conduct directed at the general public applies only in breach of contract cases, not in tort cases for breach of fiduciary duty." <u>Don Buchwald & Associates, Inc. v. Rich</u>, 281 A.D.2d 329, 330, 723 N.Y.S.2d 8 (1st Dept. 2001); <u>see also</u> <u>Carvel Corp. v. Noonan</u>, 350 F.3d 6, 25 n. 11 (2d Cir. 2003). Rather, "[t]o sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another." <u>Don Buchwald</u>, 281 A.D.2d at 330. "[T]he decision whether to award punitive damages in circumstances in which such damages are available falls within the discretion of the finder of fact . . . ." <u>In re West 56th Street Associates</u>, 181 B.R. 720, 728 n. 4 (S.D.N.Y. 1995) (citation omitted).

The Bankruptcy Court found that ARC and BPI "intentionally, deliberately and consciously disregarded the Debtor's rights to maintain and use its customer and business information for its own benefit" and "made a calculated decision that it was cheaper to steal the Debtor's business than to pay for it." (FFCL at 45.) The Court does not conclude that this determination was clearly erroneous. See Ostano Commerzanstalt v. Telewide Systems, Inc., 880 F.2d 642, 649 (2d Cir. 1989) ("The award of punitive damages rests on a . . . finding[] which we do not find clearly erroneous.").

## IV. Conclusion and Order

For the foregoing reasons, the Bankruptcy Court's Judgment is affirmed and the appeals in 06 Civ. 7587 and 06 Civ. 7588 are dismissed.

Dated: New York, New York
March 26, 2007

*/s/ RMB*

**Richard M. Berman, U.S.D.J.**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/26/07